**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

MAR Oil Company,                                Case No. 3:11CV1261

           Plaintiff

     v.                                                **ORDER**

Myron Korpan, et al.,

           Defendants

       Plaintiff MAR Oil Company is an oil and gas company that has explored potential oil and gas reserves in Northwest Ohio since 2000. Defendants are Myron Korpan, Ronald Brock, National Energy LLC, Gulflink LLC, Right of Way Land Services LLC, Imagine Mapping LLC, Chatham Holdings LLC, Solstice Energy LLC and Solstice Energy Partners LP. Korpan is a consultant who worked for plaintiff from 2000 through 2005, and began working with Brock and the associated exploration companies in 2008.  Plaintiff claims Korpan, while in possession of its trade secrets, improperly shared those secrets with the other defendants.

       Plaintiff asks that I issue a preliminary injunction ordering defendants to: 1) return MAR Oil's trade secrets and confidential and proprietary information; 2) cease and desist from disclosing or using in any manner any of MAR Oil's trade secrets or related confidential information; 3) cease and desist unfairly competing with MAR Oil; and 4) assign any and all leases acquired by them in the "Area of Mutual Interest," as defined *infra*. Plaintiff also seeks such other and further relief as I deem appropriate and just.

       Jurisdiction exists under diversity. 28 U.S.C. § 1332.

1

Pending is plaintiff's motion for a preliminary injunction. [Doc. 7-1]. For the reasons discussed below, plaintiff's request is denied.

## Background

Plaintiff and Korpan entered into a Consulting and Gross Overriding Royalty Interest ("GORI") Agreement on January 27, 2000. The agreement stated:

> This area will also be treated as an area of mutual interest A.M.I. and Myron [Korpan] agrees that this is an area of non competition and may not pursue an exploration venture on his own or with any other party without the permission of Wayne Toole. Previous and future information on this area is to be held confidential.

[Joint Ex. 2, at 1].

On July 2, 2002, Plaintiff and Korpan entered into a superseding Gross Overriding Royalty Agreement ("GORA"), incorporating the prior GORI Agreement but changing and further codifying some of the terms [Joint Ex. 1, at 1]. These changes related primarily to the scope of the Area of Mutual Interest ("AMI"). The AMI is a designated land area in Northwest Ohio.

The GORA was effective as of the effective date of the earlier GORI Agreement.[Doc. 32-2, at 1]. Section twelve of the GORA creates a term limitation on the duration of the contract:

> Notwithstanding anything herein elsewhere or to the contrary contained, any right of any party hereto to acquire any interest from any other party hereto shall cease, determine and be at an end not later than the end of five years from the effective date of this Agreement, being January 27, 2005, except as to any extension or renewal thereof and any new grant acquired in place thereof to the lands and/or leases by Grantor, or any extended period of time mutually agreed upon by the parties hereto and set forth by an amendment to this Agreement.

[Doc. 32-2, at 9].

During the term of the GORA, plaintiff invested time and money – over five million dollars between 2000 and 2010, with much of that during the GORA term – in exploration, including the production of seismic readings. Plaintiff produced thirty-three miles of two-dimensional and two

and a half square miles of three-dimensional seismic readings, and considers this information among its confidential trade secrets. Korpan had access to this material during his time consulting for plaintiff.

Plaintiff and Korpan did not extend the GORA past the January 27, 2005, date. Korpan continued, however, to work with plaintiff through a separate company, Gulf Link, LLC, until May, 2005. Gulf Link was not subject to the GORA. Plaintiff and Korpan continued to communicate sporadically after that relationship ended, speaking at least twenty to thirty times and exchanging at least twelve to fifteen e-mails in the years that followed.

Since the end of his contractual involvement with plaintiff in 2005, Korpan has retained certain materials relating to plaintiff's exploration for oil and gas reserves. These materials contain information about plaintiff's efforts, and include some of plaintiff's two and three-dimensional seismic readings. In total, Korpan has roughly seven bankers' boxes worth of information, which is now in the possession of defense counsel.

In 2008, Korpan began working with Brock and the Solstice defendants to lease land and explore for oil and gas reserves in Northwest Ohio; specifically, to lease and explore in the AMI that was the subject of the GORA. Plaintiff held a lease on what is referred to as "the Johnson property", and let that lease lapse. On November 22, 2010, after discovering defendants' subsequent lease on that land, plaintiff e-mailed Korpan to ask if the latter was involved in the other defendants' leasing and exploration efforts. That same day, Korpan confirmed his involvement with them.

Defendants have multiple leases within the previously designated AMI. Some border directly on plaintiff's leases.

Korpan has admitted to using one of the two-dimensional seismic maps to "jiggle" three lines on a map prepared for defendants' oil and gas exploration efforts. Plaintiff does not allege and defendants do not admit any further direct use of plaintiff's information in defendants' business. Defendants have also acquired their own seismic readings for use in their exploration efforts.

Following the above events, plaintiff filed the pending motion for preliminary injunction to restrain defendants' use of its trade secrets in their oil and gas exploration efforts.

**Standard of Review**

The purpose of a preliminary injunction is to "preserve the status quo." *U.S. v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004). The factors used in granting a preliminary injunction are "(1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm without the grant of the extraordinary relief; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest is advanced by the issuance of the injunction." *Washington v. Reno*, 35 F.3d 1093, 1099. I must balance these factors rather than treat each as a prerequisite to be met. *Edward Rose & Sons*, *supra*, 384 F.3d at 261.

A preliminary injunction is an extraordinary remedy, and I may grant it only if the moving party clearly and convincingly proves the need for it. *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (citations omitted).

**Discussion**

For the purposes of ruling on this motion, I need not reach the ultimate issues of whether a trade secret exists and, if so, whether it was misappropriated. As I describe below, substantial

questions of material fact remain unanswered with respect to those issues, and I am unable to make a final determination on them at this time.

## A. Statute of Limitations

Ohio's Uniform Trade Secrets Act (OUTSA), O.R.C. § 1333.61, *et seq.*, places a four-year statute of limitations on actions for misappropriation of trade secrets. A party must file a claim "within four years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." O.R.C. § 1333.66. Under OUTSA, "a cause of action does not arise until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, that he or she was injured by the wrongful conduct of the defendant." *Norgard v. Brush Wellman, Inc.*, 95 Ohio St.3d 165, 167 (2002)(citations omitted).

Defendants argue that the statute of limitations began running the moment Korpan's contractual affiliation with plaintiff ended. [Doc. 39, at 16]. The misappropriation plaintiff alleges is the disclosure of its trade secrets by Korpan to the other defendants in violation of O.R.C. § 1333.61(B)(2). The statute of limitations for a misappropriation claim cannot begin running until at least the earliest possible point at which misappropriation could have taken place. No reasonable diligence can predict that which has yet to occur.

Solstice was founded and began operations in 2008, and Korpan began working for it that year. Plaintiff does not allege disclosure of anything constituting a trade secret before that point. The statute of limitations would therefore run, at earliest, in 2012. The plaintiff filed this claim within the statute of limitations.

## B. Preliminary Injunction

As mentioned previously, the factors I consider in weighing the merits of a request for a preliminary injunction are not prerequisites, but instead factors to be balanced. I will address each in turn.

### 1. Substantial Likelihood of Prevailing on the Merits

The Ohio Supreme Court has adopted a six-part test to determine whether a trade secret exists:

> (1) [t]he extent to which the information is known outside the business; (2) the extent to which [the information] is known to [employees] inside the business; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*State ex rel. The Plain Dealer v. Ohio Dep't of Ins.*, 80 Ohio St.3d 513, 524-25 (1997) (quoting *Pyromatics, Inc. v. Petruziello*, 7 Ohio App.3d 131, 134-35 (1983)).

As discussed below, there is not enough information available at the present time to determine whether a trade secret exists and whether it was misappropriated. As a consequence, I cannot say at present that there is a substantial likelihood of the plaintiff prevailing on the merits of this claim sufficient to meet the standard for a preliminary injunction.

I now proceed to analyze each part of the *Plain Dealer* test.

#### a. The Extent to Which the Information Is Known Outside the Business

Defendants contend the information at issue is "nearly all . . . available from a public source." [Doc. 39, at 24]. Plaintiff, in turn, asserts the information is private, and makes the publicly available information more valuable. [Doc. 31, at 4-5]. Defendants' acquisition of independent seismic readings tends to give weight to plaintiff's position. Plaintiff's claim that Korpan was bound to keep this information confidential derives from an agreement that by its own terms ended in

January, 2005, yet plaintiff contends that the effect of that agreement carries on to the present day. [Doc. 31-2, at 3]. The facts as plaintiff has presented them do not weigh clearly and convincingly in its favor.

### b. The Extent to Which the Information Is Known by Employees Inside the Business

The parties have yet to address the extent to which MAR Oil's employees, or employees in the oil and gas business generally would know the information, particularly the seismic readings contained in its claimed trade secrets.

### c. Precautions Taken by the Holder of the Trade Secret to Guard the Information

Plaintiff has testified that it does not have written confidentiality agreements with any of the entities with which it currently works. [Doc. 39, at 14]. Plaintiff has specified no other active effort taken to maintain the secrecy of its trade secrets.

### d. The Savings and Value to the Holder in Having the Information

The information at issue has at least some economic value. Not only did it cost a substantial amount of money to acquire, but it tends to make the discovery of oil and gas reserves more likely and less expensive.

### e. The Amount of Effort and Money Expended

Plaintiff has "expended over five million dollars in the course of ten years on research, exploration, and drilling in Ohio." [Doc. 7-1, at 9]. The three-dimensional seismic readings cost Plaintiff over $500,000 to acquire. [*Id.*] Plaintiff has not specified the cost of its two-dimensional seismic readings, but reason dictates that they cost some non-negligible amount of money to develop.

### f. The Amount of Time and Expense Necessary
### for Others to Duplicate the Information

Due to the passage of time, the availability of substantial amounts of relevant information from the Ohio Department of Natural Resources, and advances in technology, it is unclear from the pleadings how much time and money others would have to spend to replicate the seismic readings and other information that plaintiff claims are its trade secrets.

On the whole, important questions of relevant fact still remain in determining whether the information at issue constitutes trade secrets. It is impossible to determine the likelihood of success on the merits of a misappropriation claim without first reaching the underlying issue of the trade secrets' existence. I cannot say that, at the present point, plaintiff has a substantial likelihood of prevailing on the merits.

### 2. Irreparable Harm

An injury is irreparable if it is not fully compensable by money damages. *Basicomputer Corp. Nn*1992). "[A]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Id.* The required considerations in a preliminary injunction are the degree of difficulty in calculating monetary damages and the existence of non-monetary damages.

The very existence of this lawsuit is an effective wall against injury to the plaintiff during its pendency. The legal question of whether defendants have misappropriated trade secrets places the validity of its leases and, as a result, the legitimacy of its presence in the area into question. Defendants will have a difficult – if not impossible – task in finding investors to continue their operations until this issue is resolved.

There does not appear to be any irreparable harm threatened by defendants' current and continued, but presently inactive presence in the disputed area.

### 3. Weight of Threatened Injuries to Each Party

If plaintiff's motion succeeds, it would be in a substantially better position than at present. It would be a newparty to contracts it did not negotiate, with legal rights over parties who did not agree to give plaintiff those rights.

If issued, an injunction would prohibit defendants from competing with plaintiff not just for the term of the leases: in plaintiff drills for oil and gas, it may have permanent control over the lease and its subterranean deposits. As a result, plaintiff is enriched, defendant is perhaps permanently disadvantaged, and third parties mustaccept contractual assignments without their prior assent.

Thus, granting an injunction would alter, rather than maintain the *status quo ante*.

Denial of the injunction keeps things in place as they now are. As a practical matter, due to the uncertain outcome and impact of this litigation,  defendants cannot do anything to exploit the resources underneath the disputed areas. Their inability to go forward with exploration and drilling leaves plaintiff's interest unaffected until the final resolution of the ultimate issues in this case.

The threatened harm to the defendants and to the parties from which they leased land outweighs the harm to the plaintiff.

### 4. Public Interest

"[I]t is well-established that the trade secret policies in Ohio are to maintain the standards of commercial ethics and the encouragement of invention, as well as the protection of the substantial investment of employers in their proprietary information." *Valco Cincinnati, Inc. v. N & D Machining Service,* 24 Ohio St.3d 41 (1986). A court should intervene to protect those interests,

however, only where a plaintiff has shown by clear and convincing evidence that they are entitled to that intervention, and where that intervention does not impinge on the public interest in other ways. *Edward Rose & Sons*, *supra*, 384 F.3d at 261.

There are still substantial questions of fact to be resolved before determination of whether plaintiff's information constitutes trade secrets, and, if so, whether defendants have misappropriated that information. At this point, the public interest favors denial of injunctive relief.

A court sitting in equity does not, moreover, serve the public interest by ordering an involuntary reassignment of contractual rights to a party not in privity to the original contract. This is especially true when the benefitting party has not shown that, but for the use of its misappropriated trade secrets, it would have been entitled to the rights designated to the misappropriating party.

Issuance of this preliminary injunction would not serve the public interest.

## Conclusion

For the foregoing reasons, it is hereby:

ORDERED THAT plaintiff MAR Oil's motion for preliminary injunction (Doc. 7) be, and the same hereby is denied. A scheduling conference is set for November 14, 2011 at 3:00 p.m. Out of town counsel may participate by phone.

So ordered.

s/James G. Carr
Sr. United States District Judge