**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**


MAR Oil Company,                                     Case No.  3:11CV1261

       Plaintiff

       v.                                          **ORDER**

Myron Korpan, et al.,

       Defendants

AND

Wayne Toole

       Third-Party Defendant


Plaintiff Mar Oil Company (Mar Oil) is a business engaged since 2000 in oil and gas

exploration and extraction in Northwest Ohio. Defendants are Myron Korpan, Ronald Brock,

National Energy LLC (National Energy), Gulflink LLC (Gulflink), Right of Way Land Services LLC

(Right of Way), Imagine Mapping LLC (Imagine Mapping), Chatham Holdings LLC (Chatham

Holdings), Solstice Energy LLC (Solstice), and Solstice Energy Partners LP (SEP). Korpan worked

for Mar Oil as its "landman"[1] and geologist from 2000 to 2005 and then began working with Brock and his associated exploration companies in 2008. Wayne Toole is the president of Mar Oil.

The gravamen of Mar Oil's suit against defendants is for trade secret misappropriation in violation of the Ohio Uniform Trade Secrets Act (OUTSA), O.R.C. § 1333.61 *et seq*. Mar Oil alleges that defendants improperly used its confidential and proprietary information, including seismic data, to lease land and drill in Northwest Ohio for oil and natural gas. By using Korpan and what he learned while working with Mar Oil, Mar Oil contends the defendants avoided the costs and time that Mar Oil spent for Korpan's research and development of its drilling business. Defendants counter-claim, seeking a declaratory judgment and asserting breach of contract and tortious interference with business relationships.

Jurisdiction is proper under 28 U.S.C. § 1332.

Pending are seven motions and cross-motions for summary judgment:

1. Mar Oil's motion on its claims (Doc. 195);

2. Mar Oil and Toole's motion on defendants' counter-claims (Doc. 196);

3. Korpan, Right of Way, and Gulflink's motion on Mar Oil's claims (Doc. 185);

4. Imagine Mapping and Chatham Holding's motion on Mar Oil's claims (Doc. 186);

5. National Energy's motion on its and Mar Oil's breach of contract claims (Doc. 187);

6. SEP and Solstices's motion on Mar Oil's claims (Doc. 188); and

7. Brock's motion on Mar Oil's claims (Doc. 189).

---

[1] In the industry, a landman is one who uses various methods, including seismic testing, to locate subterranean geological formations that may contain retrievable oil or natural gas. Guided by the landsman's work and discoveries, drilling companyies enter into leases with property owners to drill for the oil or gas.

Because these motions raise many of the same or similar issues and often incorporate each other's facts and arguments by reference, I decide them all in this opinion.

**Background**

On January 27, 2000, Mar Oil entered into a Consulting and Gross Overriding Royalty Interest (GORI) Agreement with Korpan as its consultant for exploring oil and gas reserves and leasing land in Marion, Wyandot, and Hardin counties (the Tri-County Area) in Northwest Ohio. The agreement stated:

> This area will also be treated as an area of mutual interest . . . Myron [Korpan] agrees that this is an area of non competition and may not pursue an exploration venture on his own or with any other party without the permission of Wayne Toole. Previous and future information on this area is to be held confidential.

(Doc. 19-1, at 1).

On July 2, 2002, Mar Oil and National Energy, Korpan's company, entered into a superseding Gross Overriding Royalty Agreement (GORA), incorporating the prior GORI Agreement but changing and further codifying some of the terms. These changes related primarily to the scope of the area of mutual interest. The agreement expired on January 27, 2005, subject to extension or renewal.

The GORA contained a confidentiality provision, stating "All information contained within this Agreement including the Area of Mutual Interest lands is to be held strictly confidential between the Grantor and the Grantee." (Doc. 195-5, at 6).

Pursuant to the GORA, Mar Oil granted National Energy a 2.5% gross overriding royalty interest in its leases in the Area of Mutual Interest. The agreement stated that if Mar Oil acquired any

interest in any lands in the Area of Mutual Interest between 2002 and 2005, Mar Oil would also convey the 2.5% royalty in those newly acquired lands.

During the term of the GORA, Mar Oil invested millions of dollars in exploration. This exploration provided Mar Oil with seismic, land leasing, and drilling information – all of which it alleges are confidential trade secrets. Korpan, as Mar Oil's landman and geologist, had access to this information during his time consulting for Mar Oil. Mar Oil states that 2D and 3D seismic information is valuable because it "reveals the geology of the area, which is particularly important for identifying fault lines and where to drill wells." (Doc. 195-1, at 14).

Mar Oil and Korpan did not extend the GORA past January 27, 2005. At the end of his contractual involvement with Mar Oil in 2005, Korpan retained ten bankers' boxes and two thumb drives containing Mar Oil's seismic, leasing, and production data. Mar Oil states that it instructed Korpan not to retain this information. Korpan kept these materials in his Texas apartment and his Right of Way office while working for the other defendants.

In 2008, Korpan began working with Brock, a landman from Texas, and formed SEP with him to lease land and explore for oil and gas reserves in the Area of Mutual Interest that was the subject of the GORA. Korpan told Brock of his prior employment as a geologist and landman with Mar Oil and Brock relied on Korpan's experience and knowledge about Ohio as he had never worked there before.

Mar Oil held a lease on what is referred to as "the Johnson property," but let that lease lapse due to an accident which killed two men and resulted in the closure of Mar Oil's wells. On November 5, 2008, SEP signed a three-year lease with the Johnsons. On November 22, 2010, after discovering SEP's subsequent lease on that land, Mar Oil emailed Korpan to ask if he was involved

in the other defendants' leasing and exploration efforts. Korpan promptly confirmed his involvement with them.

Korpan continued on SEP's behalf to solicit numerous landowners to lease their properties to SEP. He performed leasing and mapping in Ohio through his corporation, Right of Way. Korpan billed his leasing services through Gulflink and his collection of seismic data through Gulflink and Right of Way.

Korpan eventually obtained eleven leases for nine different properties for SEP. These leases were with the same landowners with whom Korpan had previously worked as a representative for Mar Oil. Of the 819,000 acres of land in the Tri-County Area, defendants leased about 950 specific acres that Mar Oil's seismic data covers or are on fault trends which Mar Oil had identified.

In December, 2010, SEP seismically shot and processed two lines of seismic data across the Johnson property. During that process, Korpan referred to a map of Mar Oil's 2D seismic information and adjusted the location of the fault lines he identified on a map for SEP. Mar Oil emphasizes the importance of determining fault lines as a predictor of possible oil or gas reserves and thus, drilling sites.

Korpan admits that he glanced at the information but only out of curiosity and that he merely "jiggled" a line on the map by 1/8 of an inch. He asserts that the jiggled map was not used to identify any well locations as they had already been selected.

In 2011, Korpan and Brock solicited potential investors to fund SEP's drilling in the Tri-County Area. Mar Oil alleges that Korpan transmitted portions of Mar Oil's proprietary information to one prospective investor, Campbell Production (Campbell). Among the Mar Oil information Campbell received were Mar Oil's monthly well productions numbers, details of Mar Oil's drilling

process, and hand-written well logs for two Mar Oil wells. Korpan admits providing this information but argues none of it is confidential. Subsequently, Brock drafted an agreement between SEP and Campbell in which Campbell would pay $2.1 million to SEP for drilling wells in exchange for a 75% interest in those wells.

Mar Oil sued defendants for trade secret misappropriation. It believes defendants' alleged misuse of its trade secrets to lease and compete in the Tri-County area resulted in damages equivalent to its exploration costs. According to Mar Oil, Korpan's disclosure of its trade secrets renders those secrets without value. Mar Oil asserts that defendants are jointly and severally liable as co-venturers and that Korpan and Brock, the individual defendants, operated shell entities, the corporate veils of which Mar Oil is entitled to pierce.

Mar Oil has also alleged several additional claims:

- tortious interference with business relationships, unfair competition, and unjust enrichment against all defendants except Brock

- breach of fiduciary duty against Korpan

- breach of contract against National Energy

Defendants counter-claimed against Mar Oil and named Wayne Toole as a third-party defendant. Defendants seek a declaratory judgment that the GORI and GORA agreements expired on January 27, 2005, except for the requirement that Mar Oil and/or Toole continue making gross overriding royalty interest payments to National Energy. They also sued for breach of contract, alleging Mar Oil/Toole have not made all of the royalty interest payments required under the GORA. Finally, they allege tortious interference with business relationships.

**Standard of Review**

A party is entitled to summary judgment on motion under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id*. at 323.

Once the movant meets that initial burden, the "burden shifts to the nonmoving party to set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

In deciding a motion for summary judgment, I accept the opponent's evidence as true and construe all evidence in the opponent's favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992). The movant can prevail only if the materials offered in support of the motion show there is no genuine issue of material fact. *Celotex*, *supra*, 477 U.S. at 323.

### Discussion

As a threshold matter, I grant summary judgment in favor of Imagine Mapping and Chatham Holdings. There is no indication that either entity has anything to do with the events giving rise to this dispute. While Korpan is a managing member of both entities, Mar Oil does not indicate what role, if any, they had in trade secret misappropriation. Mar Oil merely names them in its complaint. It does not argue in any of the numerous motions for summary judgment why Imagine Mapping and

Chatham Holdings should remain parties in this case. Thus, I grant summary judgment in favor of these two entities.[2]

## A. Mar Oil's Trade Secret Claim

OUTSA defines a trade secret as information that: 1) "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use;" and 2) "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." O.R.C. § 1333.61(D).

To prevail on a trade secret claim, a plaintiff must establish by a preponderance of the evidence: 1) the existence of a trade secret; 2) the acquisition of a trade secret as a result of a confidential relationship; and 3) the unauthorized use of a trade secret. *Heartland Home Finance, Inc. v. Allied Home Mort. Capital Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008) (citing *Hoover Transp. Serv., Inc. v. Frye*, 77 F. App'x 776, 782 (6th Cir. 2003) (per curiam)).

The Ohio Supreme Court adopted a six-factor balancing test to determine the existence of a trade secret:

1. the extent to which the information is known outside the business;

2. the extent to which it is known to those inside the business, i.e., by the employees;

3. the precautions taken by the holder of the trade secret to guard the secrecy of the information;

4. the savings effected and the value to the holder in having the information as against competitors;

---

[2] As a result, when I refer to the corporate defendants throughout this opinion, I mean only Gulflink, National Energy, Right of Way, Solstice, and SEP.

5.      the amount of effort or money expended in obtaining and developing the information; and

6.      the amount of time and expense it would take for others to acquire and duplicate the information.

*State ex rel. The Plain Dealer v. Ohio Dep't of Ins.*, 80 Ohio St. 3d 513, 524-25 (1997).

No single factor is dispositive. *Heartland Home Finance, Inc.*, *supra*, 258 F. App'x at 862. The Ohio Supreme Court, however, has emphasized that "[a] business or possessor of a potential trade secret must take some active steps to maintain its secrecy in order to enjoy presumptive trade secret status." *Plain Dealer*, *supra*, 80 Ohio St.3d at 525. "[O]nce material is publicly disclosed, it loses any status it ever had as a trade secret." *State ex rel. Rea v. Ohio Dept. of Educ.*, 81 Ohio St. 3d 527, 532 (1998).

Whether information is a trade secret is a highly fact-specific inquiry. *Thermodyn Corp. v. 3M Co.*, 593 F. Supp. 2d 978, 986 (citing *DeBoer Structures Inc. v. Shaffer Tent & Awning Co.*, 233 F. Supp. 2d 934, 948 (S.D. Ohio 2002). This is ultimately a question for a jury to determine. *Maier & Associates v. Seifert*, 1991 WL 302464, *2 (Ohio Ct. App.).

Mar Oil asserts that it has three categories of trade secrets at issue:

•     *seismic information*: raw and stacked data, interpreted data with marked horizons, maps, location of seismic lions, geographic information, and derivative products;

•     *land leasing information*: land maps and surveys, land owner contact information, plat location and acreage, lease pricing, and payment amounts; and

•     *drilling information*: sample cuttings, soil samples, well logs, and well production figures.

**1. Whether the Geological Data is a Trade Secret**

Mar Oil contends that the seismic, land leasing, and drilling information (collectively, the geological data) is a protectable trade secret under the six-factor test. Defendants argue that at a minimum there are genuine issues of material fact.

At the outset, Mar Oil notes that other courts have found this type of data to be a trade secret. *See, e.g.*, *In re TXCO Res., Inc.*, 475 B.R. 781, 810-811 (Bankr. W.D. Tex. 2012); *In re Bass*, 113 S.W.3d 735, 740 (Tex. 2003); *Phillips Petrol. Co. v. Stryker*, 723 So.2d 585, 587 (Ala. 1998); *Amoco Prod. Co. v. Laird*, 622 N.E.2d 912, 918 (Ind. 1993). Because this is a highly fact-specific inquiry, however, I still must assess whether Mar Oil's particular data is a trade secret under the six-factor test.

Among its many arguments, Mar Oil contends that its geological data is not known to anyone other than itself, its prospective and actual investors who each signed a confidential agreement with the company, and the defendants who acquired it through misappropriation. It contends that the majority of its data, such as the seismic information and production data, is not publicly available. It notes that any data it shared with vendors and employees was on a need-to-know basis. It also argues that it took reasonable steps to protect the secrecy of its information because only people who signed confidentiality agreements or were bound by the industry standard of confidentiality were privy to its trade secrets.

Defendants contend that a large portion of Mar Oil's land leasing and production information was available through public records and the Ohio Department of National Resources. It argues that the availability of that information compromised its alleged secrecy. Defendants also note that Mar Oil does not have any procedures or polices in place to maintain the secrecy of its geological data once employees or independent contractors, who admittedly may have access on a need-to-know

basis, are terminated. Defendants note that Toole only discussed confidentiality with Korpan once prior to entering the 2000 agreement and it did not come up again during his tenure.

I find that there are genuine issues of material fact as to several of the factors regarding the geological data, including the extent to which information is known inside and outside the business and the precautions taken to guard the secrecy of information. These issues include, but are not limited to, whether the public availability of some of Mar Oil's data compromised its secrecy and whether Mar Oil had appropriate and adequate mechanisms in place to maintain the secrecy of its data. Because no single factor of the six-factor test is dispositive, a jury must decide whether all, some, or none of Mar Oil's geological data constitutes a trade secret.

## 2. Whether Defendants Misappropriated
## Mar Oil's Geological Data

Assuming *arguendo* that all or some of Mar Oil's geological data is a trade secret, I must determine whether there is a genuine issue of material fact as to whether defendants misappropriated that data.

OUTSA defines misappropriation as:

1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;

2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:

a) Used improper means to acquire knowledge of the trade secret;

b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;

11

> c) Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

O.R.C. § 1333.61(B).

Mar Oil contends that both Korpan and Brock misappropriated its geological data. It argues that Korpan did so by keeping and using its data in violation of a duty of confidentiality. It contends that Brock, as an experienced landman, is liable for misappropriation because he knew or should have known that Korpan gave him misappropriated trade secrets.

### a. Korpan's Misappropriation

Mar Oil argues that Korpan owed a duty of confidentiality to Mar Oil by virtue of his position as the company's landman and geologist. It contends that there is an industry-wide standard of confidentiality among geologists and that duty extends beyond Korpan's tenure at Mar Oil. Mar Oil also contends that regardless of the duty of confidentiality, the GORA obligated Korpan to maintain the confidentiality of Mar Oil's proprietary information. It argues that the GORA's confidentiality provision has no expiration date.

Mar Oil argues that Korpan breached his duty of confidentiality by keeping ten bankers' boxes and two thumb drives of Mar Oil's confidential information after he stopped working for the company. Mar Oil notes that Korpan has admitted to keeping that information in his Texas home. He also admitted to storing 2D seismic information in Right of Way's office and consulting it when preparing maps for SEP. As a result, Mar Oil argues, Korpan enabled defendants to lease the Johnson property and eleven other leases of property immediately adjacent to Mar Oil-identified fault lines.

Mar Oil alleges that once established in the region, Korpan began soliciting investors to drill. Specifically, he transmitted details about Mar Oil's operations, such as daily well logs, royalty numbers, and its drilling process, to Campbell.

Korpan argues that he did not acquire the proprietary information through improper means but merely obtained it in conjunction with his contractual duties. Moreover, he contends that Mar Oil did not demand the information's return when the GORA expired nor was there a written policy calling for its return. Korpan notes that Mar Oil waited five years before asking him to return the information.

Korpan also argues that he had no fiduciary duty to Mar Oil as an independent contractor once the GORA expired. He asserts that regardless of the GORA, Mar Oil's failure to demand or prescribe or otherwise take steps for the information's obviated any duty to maintain secrecy. Moreover, other events in the interim, including the buying and selling of Mar Oil and Toole's loss of access to Mar Oil's data in 2004 show a failure to safeguard any proprietary information.

Finally, Korpan argues that he never materially used Mar Oil's seismic data. He states that he only peeked at Mar Oil's 2D seismic dat and jiggled an already-drawn fault line 1/8 of an inch *after* SEP acquired leases in Ohio and *after* he prepared a fault trend map. Korpan stated that he did not need to look at the data but scientific curiosity got the better of him. He also contends Toole admits Korpan's action were not material. Thus, Korpan contends there was no misappropriation.

Contrary to Korpan's contentions, I find, in light of the uncontested testimony of Mar Oil's expert, Arthur Berman, Korpan owed Mar Oil a duty of confidentiality that outlasted his tenure as the company's geologist. According to Berman, there is a generally accepted industry-wide standard of confidentiality among geoscientists. He further notes that someone with Korpan's experience in

the oil industry would necessarily know of this duty of confidentiality. Such understanding is underscored by Korpan's membership in the American Association of Petroleum Geologists and Texas Board of Professional Geoscientists, which both impose a duty of confidentiality on persons in the profession. Thus, regardless of the GORA, Korpan was aware of his professional obligation to maintain the confidentiality of his client's proprietary information.[3]

Korpan's argument that Mar Oil did not demand its propriety information back for more than five years is not persuasive, much less dispositive. The fact that Mar Oil did not call on Korpan to return its proprietary this information does not affect, much less eliminate his obligations under the industry-wide confidentiality standard. The same is true even if Mar Oil had no policies or procedures in place for retaining proprietary information. As an experienced geologist, Korpan knew of this industry-wide standard. Mar Oil's inaction does not change that standard or Korpan's duties.

As to whether Korpan misappropriated Mar Oil's geological data in breach of his duty of confidentiality, I find there are genuine issues of material fact. Mar Oil presents a slew of circumstantial evidence highly suggestive of misappropriation. Most notably, Mar Oil notes that Korpan held onto ten bankers' boxes and two USB drives of proprietary data for several years while he was working for the other defendants. During that time, defendants leased the Johnson property, which Mar Oil had previously leased, as well as eleven other leases of property. The Tri-County Area has over 819,000 acres of land and defendants leased about 950 areas immediately adjacent to fault lines Mar Oil identified. Moreover, Korpan admitted to at least "peeking" at some of that data and adjusting a map he prepared based on what he saw.

---

[3] Independent of the industry standard of confidentiality, I also find that the GORA establishes a duty of confidentiality which does not expire. *See infra* Discussion, Part E, § 1.

Defendants argue, however, that while Korpan may have peeked at the data, he did so when the data was no longer relevant because SEP had already leased the lands in question. Moreover, if Korpan's peeking was not material and was the only action he took related to the data, there is no misappropriation. *See* Restatement (Third) of Unfair Competition § 40 (1995) ("[i]f the contribution made by the trade secret is so slight that the actor's product or process can be said to derive from other sources of information or from independent creation, the trade secret has not been 'used' for purposes of imposing liability."). Korpan also points out that going through the data he retained would be extremely time-consuming and not worth his efforts.

Because of the disputes in evidence, a jury must determine whether Korpan's retention, access to, and use (whatever it find his use to have been) of Mar Oil's geological data and the resulting leases defendants acquired constitutes misappropriation.

### b. Brock's Misappropriation

Mar Oil also alleges that Brock misappropriated its trade secrets because he knew or should have known that Korpan misappropriated them. Mar Oil argues that Brock admittedly had no experience in the oil industry in Ohio and relied exclusively on Korpan's knowledge. Mar Oil contends that Brock, as a landman with over thirty years of experience, should have known that the information Korpan provided him is confidential in the oil and gas industry. Finally, Mar Oil argues that Brock induced disclosure of its proprietary information by introducing Korpan and Campbell, an investor. Using that information, Brock then drafted a Joint Exploration Agreement between defendants and Campbell.

Defendants argue that Brock had no relationship with Mar Oil and thus had no direct duty to the company. They contend that Brock did not induce Korpan to breach any duty and Brock was

not aware that Korpan possessed any of Mar Oil's alleged trade secrets. Defendants argue that according to Toole's deposition and Mar Oil's expert, Berman, the real issue is not Brock's knowledge but his lack of it. Both Toole and Berman believe that Brock should have done some investigatory work to determine whether Korpan had misappropriated Mar Oil's trade secrets.

While defendants' arguments regarding Brock's actual knowledge about the trade secrets are well-taken, defendants fail to address Mar Oil's contention that, under O.R.C. § 1333.61(B), Brock *should have known* that Korpan disclosed trade secrets to him. Under the statute, the defense of a lack of knowledge is not enough. Mar Oil puts forth credible evidence that Brock, as an experienced landman who knew that Korpan was previously Mar Oil's geologist and landman, should have inquired about the source of the data Korpan gave him. Moreover, Brock may have used the alleged trade secrets to solicit an investor, Campbell, which potentially would constitute a separate, independent, and actionable act of misappropriation.

However, given that three years had passed since Korpan worked for Mar Oil and Brock was not familiar with the Ohio area, a jury may find it reasonable that Brock relied on Korpan without conducting further investigatory work. Thus, I find that there is a genuine issue of material fact as to whether Brock misappropriated Mar Oil's trade secrets.

### 3. Damages

Under OUTSA, damages may include actual loss resulting from misappropriation and unjust enrichment that does not take into account actual loss. O.R.C. § 1333.63(A). Damages may include "a reasonable royalty that is equitable under the circumstances considering the loss to the complainant, the benefit to the misappropriator, or both." *Id*. Willful and malicious misappropriation can result in an award of treble damages and attorney's fees. *Id.* §§ 1333.63(B) & 1333.64(C).

In my September 4, 2013 Order, I held that the cost of the acquisition of the geological data is an appropriate measure of damages, stating "what MAR spent and SEP thereby saved would appear to be a proper yardstick for a damage award." (Doc. 181, at 8). This is consistent with *Avery Dennison Corp. v. Four Pillars Enters. Co.*, 45 F. App'x 479, 486 (6th Cir. 2002) (citing *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 535-36 (5th Cir. 1974)) (damages may be measured by "the value of the secret to the defendant").

Mar Oil contends that it spent close to ten years and $2.9 million accumulating valuable geological data. It states that defendants took only months to misappropriate this knowledge, use the knowledge to lease land, approach a potential investor, and then give away the information in hopes of making a deal for $2.1 million to drill wells and a 25% royalty interest in the wells.

Mar Oil also notes that the Tri-County Area encompasses over 819,000 acres and defendants leased about 950 specific acres that are covered by Mar Oil's seismic data or are on the fault trends identified by Mar Oil. This congruence is highly suggestive of defendants' use of Mar Oil's trade secrets, rather than generally available information about Ohio geography and geology. If so, Mar Oil alleges, the defendants clearly benefitted from Mar Oil's trade secrets.

Mar Oil further argues that Korpan's misappropriation was willful and malicious, entitling it to treble damages and attorney's fees under OUTSA. Mar Oil alleges that Korpan set up a directly competing venture using Mar Oil's geological data while fully aware of the data's confidential nature.

Defendants argue that there is no evidence defendants derived any benefit from Mar Oil's data. They state that they acquired leases, purchased and shot their own seismic data, and selected well locations using information they purchased or found in the public domain. Korpan states that

17

he did not rely on Mar Oil's data, which would have been cumbersome, but rather identified open acreage by using his knowledge of the geography, publicly available recorded leases and maps, and the internet. He merely peeked at Mar Oil's 2D seismic data and jiggled a fault line by 1/8 of an inch which Toole admitted was not material. Additionally, defendants did not drill new wells or use the disputed information, which is now in Mar Oil's hands.

I find there are genuine issues of material fact. The parties present conflicting evidence of the value of the trade secrets to the defendants which a jury must resolve.

Importantly, while Mar Oil seeks damages for defendants' alleged use of all of its geological data, if defendants only benefitted from a portion of that data, then they should pay damages corresponding only to that portion. If a jury finds that defendants did not materially use Mar Oil's seismic data, for example, but they did use its land leasing information, the damages would consist only of the value of the land leasing information. Because damages are measured by the value of the secret to the defendant under *Avery*, *supra*, defendants should not be charged for data that did not benefit them in some way.[4]

Regarding Mar Oil's claim for treble damages and attorney's fees, again, it is for a jury to determine whether Korpan's actions were willful and malicious and whether to award punitive damages to Mar Oil.

### B. Joint and Several Liability

---

[4] Defendants also argue that Mar Oil's theory of lost profits fails because it is based exclusively on its expert's reliance of an inadmissible hearsay document, the Ryder Scott Report. As I stated in my September 4, 2013 Order, if Mar Oil's expert can lay a proper foundation for the report, it may be admissible. (Doc. 181, at 12 n.3). Mar Oil appears to seek only damages for the value of the trade secrets to defendants – not its lost profits. (Doc. 195-1, at 39 n.58). Thus, I reserve judgment on whether the Ryder Scott Report is inadmissible hearsay if Mar Oil does pursue its lost profits theory.

Mar Oil also argues defendants should be held jointly and severally liable for misappropriation of its trade secrets because: 1) as partners in SEP, Korpan and Brock are liable for the partnership's wrongdoings; 2) all defendants have been operating as a joint venture; and 3) defendants are alter egos of each other which requires piercing of the corporate veil.

## 1. Partner Liability

In Ohio, a limited partner is not liable for the obligations of a limited partnership unless, among other things, he or she "participates in the control of the business." O.R.C. § 1782.19(A). In that case, the limited partner is "liable only to persons who transact business with the limited partnership with actual knowledge of the limited partner's participation in control." *Id.*

Mar Oil argues that Korpan, as a limited partner in SEP, is liable for the obligations of a limited partnership since he participated in the control of SEP and Mar Oil had actual knowledge of that control. Defendants argue that Korpan is not liable because Mar Oil did not transact business with SEP.

I find defendants' arguments persuasive. Section 1782.19(A) unambiguously reads that a limited partner may be liable *only to persons who transact business with the limited partnership*. In this case, Mar Oil does not allege that it transacted any business with SEP. Mar Oil's argument that it had actual knowledge of Korpan's control in the limited partnership does not matter.

In the only case Mar Oil cites on this point, *Hommel v. Micco*, 76 Ohio App.3d 690 (1991), the court found a limited partner liable because he had exercised total control over the limited partnership. The limited partner, however, transacted business directly with the complainant.

Here, Mar Oil had cut ties with Korpan three years before SEP came into existence. Mar Oil did not enter into any business agreements with SEP or even Korpan, individually. Under the statute,

even if Korpan participated in control of SEP, he is not liable because he did not transact any business with Mar Oil, either individually or on behalf of SEP. Thus, I grant summary judgment in favor of defendants on this claim.

## 2. Joint Venture

Under Ohio law, a joint venture is a partnership for the purposes of a single business enterprise. *Anchor v. O'Toole*, 94 F.3d 1014, 1024 (6th Cir. 1994). To establish the existence of a joint venture, there must be:

1. A joint contract;

2. An intention to associate as joint venturers;

3. Community of interest and control, including contributions to the joint venture;

4. The mutual right to direct and control the purpose of the joint venture; and

5. An agreement for the division of profits and losses.

*Id*.

A party must establish all the elements of a joint venture with credible evidence to sustain a motion for summary judgment. *Id*.

Mar Oil argues that Brock and Korpan acted as joint venturers to pursue joint oil discovery and drilling operations in Ohio. It notes that Brock and Korpan co-own the corporate defendant entities either solely, jointly, or with James Gallant, a mutual friend and partner. Mar Oil points out that Korpan told Brock about Mar Oil and the Johnson lease and directed Brock to contact Mar Oil and the Johnsons in 2008. Mar Oil also asserts that Korpan created, controlled, and used  several shell entities to engage in misappropriation of Mar Oil's trade secrets and shield their owners from liability.

Defendants first argue that Mar Oil failed to plead this theory in its complaint and thus I cannot properly consider it. Defendants also argue that even if I do consider this theory, Mar Oil has not pointed to any agreement between defendants establishing a joint venture relationship. Nor has Mar Oil alleged or argued that defendants agreed to jointly share profits and losses. Because, defendants argue, both are necessary elements in a joint venture theory, *see, e.g., Carey v. Seeley's Ceramic Serv., Inc.*, 1994 WL 124849, *2 (Ohio Ct. App.), Mar Oil fails to meet its burden of proof that a joint venture existed.

While Mar Oil did not use the phrase "joint venture" in its complaint, it put defendants on notice of an underlying joint venture theory by pleading that each corporate entity is "owned and/or controlled" by the individual defendants and that the individuals defendants acted "individually and through their entities" at all times. (Doc. 1, at 3-4, 9). Moreover, Mar Oil responded to defendants' discovery requests stating its theory that defendants were acting in a joint venture with each other. Thus, Mar Oil's joint venture theory satisfies the liberal notice pleading standard.

As defendants argue, however, despite abundant discovery, Mar Oil presents no evidence to satisfy the elements of a joint venture. Mar Oil does not provide an evidentiary basis on which a jury could find that there was an explicit or implicit agreement regarding division of profits and losses. Rather, it appears to make allegations without an evidentiary basis and conflate its joint venture and veil-piercing arguments. Thus, I grant summary judgment to defendants on this claim.

### 3. Veil-Piercing

Mar Oil argues Korpan ran various entities, including GulfLink, National Energy, Right of Way, which served no legitimate business purpose other than as shields against liability. Mar Oil notes defendants admit there are no corporate documents or tax returns for several of these entities.

Defendants allege that Solstice and SEP have no funds. Mar Oil contends that Korpan was billing and dispersing funds on behalf and between these entities, demonstrating that they are sham entities.

Defendants argue that Mar Oil's veil-piercing theory is not properly before me because Mar Oil failed to plead it in its complaint. Defendants note that Mar Oil's complaint only alleges that "National Energy, Gulflink, Imagine Mapping, and Chatham are owned and/or controlled by Korpan" and "Right of Way is owned and/or controlled by Korpan and Brock." Defendants contend that Mar Oil does not plead how Korpan or Brock exercised control over each defendant entity to commit fraud or some other illegal act.

Citing *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of America, v. Aguirre*, 410 F.3d 297, 302 (6th Cir. 2005), defendants also contend that there is no such thing as a veil-piercing of the alter ego doctrine. In other words, a plaintiff cannot pierce the corporate veil of one corporation to reach its sister corporation. Defendants note that while the entities may have common individual officers and engage in similar lines of work, they are separately incorporated and the entities do not have an ownership interest in each other. Thus, they argue, Mar Oil's veil-piercing theory fails.

I find Mar Oil's veil-piercing theory satisfies the liberal notice pleading standard.

Under Ohio law, one corporation may be held liable for the actions of another if:

1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own; 2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud, an illegal act, or a similarly unlawful act against the person seeking to disregard the corporate entity; and 3) injury or unjust loss resulted to the plaintiff from such control and wrong.

*Transition Healthcare Associates, Inc. v. Tri-State Health Investors, LLC,* 306 F. App'x 273, 280 (6th Cir. 2009) (citations omitted).

To satisfy the first prong, also known as the alter ego doctrine, plaintiff must show that corporations are "fundamentally indistinguishable." *Id*. Ohio courts consider a variety of factors to decide the first prong, including:

> (a) grossly inadequate capitalization; (b) failure to observe corporate formalities; (c) insolvency of the debtor corporation at the time the debt was incurred; (d) the parent holding itself out as personally liable for certain subsidiary obligations; (e) diversion of funds or other property of the subsidiary for the parent's use; (f) the absence of corporate records; and (g) the fact that the subsidiary was a mere facade for the operations of the parent.

*Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 724 (6th Cir. 2007).

While defendants are correct that Ohio law does not allow the piercing of the veil of a sister company, *Minno v. Pro-Fab, Inc.*, 121 Ohio St.3d 464, 468 (2009), Mar Oil does not seek that. Rather, it argues that I must pierce the veil of the various defendant corporate entities which would create liability for Korpan and Brock, individually.

Korpan is a common actor in all the defendant entities. As the owner of National Energy, he initially acquired Mar Oil's proprietary information. Korpan then obtained leases and seismic data in the name of SEP where he was a partner with Brock. Gulflink often paid for those leases, however, and Gulflink and Right of Way paid for the seismic data. Korpan signed those checks and SEP has not repaid Gulflink or Right of Way. Finally, despite not doing business in Ohio, being unable to produce tax returns and invoices, and indicating that it had no funds, Solstice distributed $55,000 between Brock and Korpan.

Defendants present nothing to explain away the actions of and interrelationships between the various entities. Instead, they focus on the fact that the corporate entities have no ownership interest

in each other. Because, however, the piercing of the veil relates back to Korpan and Brock – and not to sister corporations – their argument misses the mark.

I find Mar Oil satisfies its burden regarding this first prong.

With regard to the second and third prongs of the veil-piercing test, if a jury finds that defendants did misappropriate Mar Oil's trade secrets and there were damages as a result, then Mar Oil can pierce the corporate veil of Gulflink, National Energy, Right of Way, Solstice, and SEP and hold the individual defendants behind those corporations liable.

### C. Mar Oil's Common Law Claims

OUTSA expressly preempts "conflicting tort law, restitutionary law and any other law of this state providing a civil remedy for misappropriation of a trade secret." O.R.C. § 1333.67. For a common law claim to survive, it must possess an "independent factual basis" separate from the factual allegations establishing an OUTSA claim. *Office Depot, Inc. v. Impact Office Prods., LLC*, 821 F. Supp. 2d 912, 921 (N.D. Ohio 2011). Then, "the portion of the claim supported by an independent factual basis survives preemption." *Id*.

Defendants move for summary judgment on Mar Oil's common law claims for tortious interference with a business relationship, unfair competition, breach of fiduciary duty, and unjust enrichment. They argue that Mar Oil's common law claims all rely upon the same operative facts – namely, that defendants misappropriated Mar Oil's confidential and proprietary information and achieved a benefit by doing so.

Mar Oil does not respond to defendants' argument and thus abandons its common law claims. *Clark v. City of Dublin*, 178 F. App'x 522, 524–25 (6th Cir. 2006) (affirming trial court's

finding that a party's failure to properly respond to the arguments raised in a motion for summary judgment constituted an abandonment of those claims).

Moreover, as a matter of law, defendants are correct. Mar Oil's common law claims are merely a restatement of the same operative facts that form the basis of its OUTSA claim. *Thermodyn*, *supra*, 593 F. Supp. 2d at 990. To proceed on its common law claims, Mar Oil would present the same evidence as with its trade secret misappropriation claim.

Thus, I grant summary judgment in favor of defendants on Mar Oil's tortious interference, unfair competition, breach of fiduciary duty, and unjust enrichment claims.

### D. Mar Oil's Breach of Contract Claim

National Energy seeks summary judgment on Mar Oil's breach of contract claim. Mar Oil alleges that National Energy breached the GORA by violating its prohibitions on competition with Mar Oil in the Area of Mutual Interest and disclosing Mar Oil's confidential information.

National Energy argues that it could not have breached the restrictive covenant in the GORA because it does not perform any operations. Rather, its only act is receiving the overriding royalty interest payments from Mar Oil. National Energy further argues that, in any event, the non-compete provision is not temporally or geographically reasonable.

Mar Oil contends that the issue is not whether National Energy can compete with it but rather that National Energy and Korpan used Mar Oil's trade secrets to compete with it. Mar Oil does not address National Energy's argument that it cannot breach the restrictive covenant because it does not perform any operations.

Because a jury must determine whether Korpan misappropriated trade secrets, I find that there is a genuine issue of material fact. If Korpan, acting through National Energy, misappropriated

Mar Oil's trade secrets, then Korpan, in the guise of National Energy, breached its contract with Mar Oil by improperly using Mar Oil's trade secrets to compete. On the other hand, if it did not misappropriate the trade secrets, there is no issue with National Energy competing with Mar Oil and there is no breach of contract.

## E. Defendants' Counter-Claims

Mar Oil moves for summary judgment on defendants' three counter-claims: 1) declaratory judgment clarifying the GORA; 2) breach of contract; and 3) tortious interference with business relationships.

## 1. Declaratory Judgment Claim

Defendants seek a declaration that the GORA expired on January 27, 2005, except for Mar Oil's obligation to make gross overriding royalty interest payments. Defendants assert that Section 12 of the GORA unambiguously states that the contract, including the confidentiality provision, expires on that date.

Mar Oil contends that under the GORA's unambiguous language, the confidentiality provision has no expiration date. If further argues that if there is any ambiguity in the GORA, parole evidence resolves it in favor of Mar Oil.

Because I find the language of the GORA clearly and unambiguously intends the confidentiality provision to remain effective indefinitely, I do not consider the parties' parole evidence arguments.[5]

---

[5] Mar Oil notes that Korpan destroyed several documents that related to his understanding of the GORA. It argues that Korpan intentionally engaged in bad faith spoilation of evidence and thus seeks sanctions for his conduct. Because I do not rely on those documents and their destruction (whether intentional or not) does not affect my ruling, I decline to sanction Korpan at this time. If, however, the destruction of those documents plays a role as this case continues, Mar Oil may move

Section 8 of the GORA contains the confidentiality provision:

All information contained within this Agreement including the Area of Mutual Interest lands is to be held strictly confidential between the Grantor and the Grantee.

(Doc. 195-5, at 6).

Section 12 details the term length of the GORA:

Notwithstanding anything herein elsewhere or the contrary contained, *any right of any party hereto to acquire any interest from any other party hereto shall cease*; determine and be at an end not later than the end of five years from the effective date of this Agreement, being January 27, 2005, except as to any extension or renewal thereof and any new grant acquired in place thereof to the lands and/or leases by Grantor, or any extended period of time mutually agreed upon by the parties hereto and set forth by an amendment to this Agreement.

*Id.* at 7 (emphasis supplied).

As Mar Oil notes, the duty to maintain its data strictly confidential is not a right to acquire an interest. Section 12's termination provision only refers to the right to acquire an interest. This is consistent with Section 8's first paragraph regarding a 2.5% gross overriding royalty interest.[6] That paragraph explicitly refers to Section 12 in determining an expiration date for that interest. Thus, the language of the GORA is in harmony and there is no ambiguity regarding termination dates.

_____

for sanctions against Korpan and I will decide the issue at that time.

[6] The first paragraph of Section 8 provides:

There shall be established an Area of Mutual Interest as further set forth on the attached Schedule "A" which shall run with and be binding upon the lands until January 27, 2005 *or the date set out in Clause 12 of this Agreement*. In the event Grantor acquires any interest in those lands which falls within the area cross-hatched on the attached Schedule "A" then Grantor shall convey and reserve unto the Grantee an interest in such acquired lands in the form of a gross overriding royalty amounting to two and one-half (2 ½ %) percent of Grantor's interest so acquired pursuant to Paragraph 2(f) of this agreement.

(Doc. 195-5, at 6) (emphasis supplied).

The confidentiality provision itself, however, in Section 8 does not have an end date. Section 12 does not address the termination of the confidentiality provision. Thus, I find that, under the GORA's own terms, the confidentiality provision does not expire – only the right to acquire an interest does.

## 2. Breach of Contract

Defendant National Energy argues that Mar Oil breached the GORA when Mar Oil stopped paying National Energy an overriding royalty interest of 2.5% after December, 2010. National Energy contends that under Schedule D of the GORA, titled an Assignment of Overriding Royalty Interest, it is entitled to receive royalty interest payments from Mar Oil as long as the Assignment was executed and Mar Oil's wells remain in production. National Energy argues that the Assignment is a separate and independent contract from the GORA and regardless of any breaches to the GORA, Mar Oil must continue making payments to National Energy.

Mar Oil argues that the Assignment is not a separate contract but merely an exhibit to the GORA. It further contends that Korpan's trade secret misappropriation was a material first breach to the GORA and thus his actions relieved Mar Oil of its obligation to perform under the contract.

First, National Energy's argument that the Assignment is an independent contract from the GORA is without merit. Nothing about the Assignment indicates that it is an independent contract. It is merely an exhibit to the GORA and, by its own terms, is "[a]ttached to and forming part of a Gross Overriding Royalty Agreement dated July 2, 2002, effective January 27, 2000." (Doc. 195-5, at 12). Thus, in deciding National Energy's breach of contract claim, I must read the Assignment and GORA together as one contract.

Next, I must determine whether defendants committed the first material breach to the contract. As Mar Oil correctly notes, if a party materially breaches a contract, the other party is relieved of its obligation to perform under the contract. *First Energy Solutions v. Gene B. Click Co.*, 2007 WL 4554402, *9 (Ohio Ct. App. 2007).

Because I denied all motions for summary judgment on Mar Oil's trade secret misappropriation claim, I also deny summary judgment here. A jury must determine whether Korpan, acting individually and/or through National Energy, did in fact misappropriate Mar Oil's trade secrets. If they did and it was before December, 2010, when Mar Oil stopped paying royalty interest to National Energy, then Mar Oil did not breach the contract because Korpan initially breached his duty of confidentiality under the GORA. Revealing and using a trade secret, especially one which saves a company significant time and expense, is a textbook example of a material breach. National Energy should not continue benefitting from the GORA by receiving interest payments if this is the case.

If, on the other hand, a jury finds that there was no trade secret misappropriation and defendants did not breach a duty of confidentiality, then National Energy is entitled to receive its royalty interest pursuant to the terms of the GORA and the Assignment.

### 3. Tortious Interference with Business Relationship

Mar Oil also seeks summary judgment on defendants' claim for tortious interference with business relationships. Defendants do not respond to Mar Oil's arguments and thus have abandoned this claim. *See Clark*, *supra*, 178 F. App'x at 524–25.

### Conclusion

In summary, I find that there are genuine issues of material fact as to Mar Oil's: 1) trade secret misappropriation; 2) veil-piercing; and 3) breach of contract claims. Regarding defendants' counterclaims, I find that there are genuine issues of material fact as to National Energy's breach of contract claim. It is, accordingly

ORDERED THAT:

1. Mar Oil's motion for summary judgment on its trade secret misappropriation claim (Doc. 195) be, and the same hereby denied;

2. Mar Oil and Toole's motion for summary judgment on defendants' counterclaims (Doc. 196) be, and the same hereby granted in part and denied in part;

3. Korpan, Right of Way, and Gulflink's motion for summary judgment (Doc. 185) on Mar Oil's claims be, and the same hereby granted in part and denied in part;

4. Imagine Mapping and Chatham Holding's motion for summary judgment (Doc. 186) on Mar Oil's claims be, and the same hereby granted;

5. National Energy's motion for summary judgment (Doc. 187) on its and Mar Oil's breach of contract claims be, and the same hereby denied;

6. SEP and Solstice's motion for summary judgment (Doc. 188) on Mar Oil's claims be, and the same hereby granted in part and denied in part; and

7. Brock's motion for summary judgment (Doc. 189) on Mar Oil's claims be, and the same hereby granted in part and denied in part.

So ordered.

/s/ James G. Carr
Sr. United States District Judge